UNITED STATES of America,
Plaintiff,

v.

Jason Richard ALLISON, Defendant.

No. 4:08–cr–00058–JEG.

United States District Court,
S.D. Iowa,
Central Division.

July 24, 2009.

Emily K. Nydle, United States Attorney's Office, Des Moines, IA, for Plaintiff.

James F. Whalen, Des Moines, IA, for Defendant.

## ORDER

JAMES E. GRITZNER, District Judge.

This matter comes before the Court on a Motion to Suppress brought by Defendant Jason Richard Allison (Defendant), which the Government resists. The Court held an evidentiary hearing on the motion on April 24, 2009. Assistant United States Attorney Emily Nydle represented the Government. Attorney James Whalen represented Defendant. After the hearing, the Court requested further briefing in light of *Arizona v. Gant,* —— U.S. ——, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). The supplemental briefing is now complete. The matter is fully submitted and ready for disposition.

## I. BACKGROUND

On March 11, 2008, City of Altoona Police Officer Amos Purcell IV (Officer Purcell) was investigating a wanted persons case, looking to apprehend Amber Shipp

(Shipp) for outstanding warrants. Prior to Officer Purcell's shift that morning, law enforcement officials had spotted two vehicles registered to Amber Shipp at a motel parking lot in Altoona, Iowa. Acting on this information, Officer Purcell went to the motel, showed the desk clerk a picture of Shipp, and asked whether the clerk had seen Shipp or knew whether she was registered at the motel. The desk clerk had not seen Shipp and said she was not registered at the motel. Officer Purcell left contact information to allow the desk clerk to contact law enforcement if she later saw Shipp, and then Officer Purcell left to set up a stakeout monitoring the two vehicles.

While conducting surveillance on the vehicles, Officer Purcell contacted Sergeant Lonnie Peterman (Sergeant Peterman) with the Mid–Iowa Narcotics Enforcement Task Force (MINE Task Force) to obtain further information about Shipp. Sergeant Peterman informed Officer Purcell that the MINE Task Force was currently investigating Shipp, believing that she and her boyfriend, Defendant, were selling methamphetamine they received from Scott Nicholson (Nicholson), a large-quantity methamphetamine dealer in the Des Moines area. Sergeant Peterman alerted Officer Purcell that Defendant or Nicholson could potentially be with Shipp, that Defendant potentially had a warrant for his arrest, and that an informant said that the fugitives probably had weapons.

Officer Purcell also called Polk County Sheriff's Deputy Jake Hedgecock (Deputy Hedgecock), who was assigned to the U.S. Marshal's Fugitive Task Force (FTF), to ask for assistance in apprehending Shipp. Deputy Hedgecock then contacted Deputy U.S. Marshal Mark Shepherd (Deputy Shepherd), who was also assigned to the FTF, for additional backup in apprehending Shipp. Deputies Shepherd and Hedgecock then also set up surveillance on the motel.

At approximately 10:00 a.m., law enforcement received a call from the motel's desk clerk, saying she had seen a taxicab pull up to the motel and pick up a male and a female passenger, whom the clerk believed to be Shipp. Officer Purcell received the information and began following the taxicab. Deputies Shepherd and Hedgecock also observed Shipp and a male leaving in the taxicab, and they joined the pursuit. As he neared the vehicle, Officer Purcell could distinguish two passengers inside. Officer Purcell testified that the female passenger turned around and looked at him in his patrol car, at which point he recognized her as Shipp. Officer Purcell then testified that he observed Shipp say something to the male passenger, who slumped down in the back seat of the taxicab. At the time, Officer Purcell was unable to identify the male passenger, who was wearing a baseball hat and sunglasses.

Officer Purcell communicated what he had seen to Deputies Shepherd and Hedgecock and proceeded to initiate a traffic stop of the taxicab. Defendant was seated in the back seat on the driver's side of the vehicle, and Shipp was seated on the opposite side. Deputy Hedgecock pulled alongside the taxicab and, after exiting his vehicle, pointed at the occupants of the cab and told them to show their hands. Deputy Hedgecock testified that Defendant only raised one hand in response to his request. Officer Purcell exited his vehicle and walked to the right side of the taxicab, where he ordered Shipp out of the taxicab. Upon confirming that Shipp had two outstanding warrants—one for a probation violation for illegal possession of a prescription drug, first offense, and the other for failing to appear in court on a charge of playing her stereo too loudly—Officer Purcell took Shipp into custody and placed her in the back seat of his patrol car.

Deputies Hedgecock and Shepherd then moved to Defendant's side of the taxicab. Deputy Hedgecock testified that Defendant was bent down low in his seat. Deputy Shepherd opened the door, grabbed Defendant, and removed him from the taxicab, leaning him over the vehicle's rear side panel. Deputies Hedgecock and Shepherd then handcuffed Defendant and performed a *Terry*[1] patdown to search for weapons. During this time, Defendant was also surrounded by a third law enforcement officer, identified at the hearing as Deputy Formaro. Deputy Hedgecock testified that, at that moment, Defendant was not under arrest but was being searched for reasons of officer safety. Deputy Shepherd testified that Defendant, handcuffed and surrounded by three law enforcement officers, was under control and posed no threat to the officers. Both Officer Purcell and Deputy Hedgecock testified that Defendant's actions in slumping down in his seat and not immediately showing both his hands were significant factors that raised their suspicions and influenced their decision to detain him.

Deputy Hedgecock proceeded to ask Defendant his name, and then passed that information along to the dispatcher to see if there were any active warrants for Defendant's arrest. A black, zippered, nylon gym bag was laying in the middle of the back seat, and Deputy Hedgecock went to remove it. Deputy Hedgecock testified that the bag was unzipped, but closed, and he was unable to see into it when he reached into the taxicab; however, as he pulled the gym bag out of the taxicab, the top flap on the soft bag came open, and he saw a carton of cigarettes containing a glass pipe. In his report, Officer Purcell wrote that Deputy Hedgecock had informed him that the gym bag was closed and lying in the middle of the seat, but Deputy Hedgecock opened it and saw the glass pipe.[2] Deputy Hedgecock testified that he asked Defendant whether the gym bag belonged to him, and Defendant responded that it did. At no time prior to questioning Defendant about his identity or ownership of the gym bag did any law enforcement officials read Defendant his *Miranda*[3] rights.

Officer Purcell radioed his dispatcher to perform a warrant check on Defendant and was notified that Defendant had one outstanding warrant from Polk County due to a probation violation for illegal possession of a prescription drug, second offense. After confirming that Defendant had an outstanding warrant for his arrest, Defendant was taken into custody. City of Altoona Police Lieutenant Dennis Parker (Lieutenant Parker) arrived at the scene to take possession of the gym bag and transport it to police headquarters. Lieutenant Parker testified that, when Deputy Hedgecock handed him the gym bag, Deputy Hedgecock said he found a "crank" pipe when he unzipped the gym bag. During a search at the police station, law enforcement found over $900 in cash on Defendant's person and from the black bag approximately $7000 in cash, some digital scales, a glass pipe, and fourteen plastic bags containing approximately 29 grams of methamphetamine each.

---

**1.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**2.** On the video recording of the stop, Officer Hedgecock's back is to the camera, and his body conceals the gym bag on the trunk of the taxicab as the officer makes a movement that appears consistent with opening the zipper of the bag. Because the bag is not in view, and the officer's movement would also be consistent with a different action, the Court does not find the video to be inconsistent with Officer Hedgecock's sworn testimony.

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

On April 8, 2008, Defendant was indicted with one count of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), and 18 U.S.C. § 2 (Count One). On February 6, 2009, Defendant moved to suppress statements made to the officers and other evidence obtained in the search, contending that (1) the officers violated Defendant's Fourth Amendment rights by forcibly detaining him and questioning him about his identity; (2) the search of the gym bag exceeded the permissible scope of the *Terry* search and was consequently an illegal seizure; (3) the statements made by Defendant should be suppressed as fruit of the illegal stop and search; and (4) the statements should be suppressed because they were made before Defendant had been advised of his *Miranda* rights.

## II. DISCUSSION

### A. Violation of Defendant's Fourth Amendment Rights

■ The Fourth Amendment states that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. If law enforcement officers possess a reasonable suspicion of criminal activity, they may briefly detain a suspect to investigate the possible criminal activity, even though there is no probable cause for an actual arrest. *See Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). If the officer also reasonably believes the person may be armed and dangerous, the officer may frisk the suspect for weapons. *See id.* at 24, 88 S.Ct. 1868. The detention is permissible to determine the suspect's identity or to maintain the status quo while obtaining more information. *See Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). The officer may ask "a moderate number of questions to

determine the person's identity and to try to obtain information confirming or dispelling the officer's suspicions." *United States v. Rodriguez–Arreola*, 270 F.3d 611, 617 (8th Cir.2001) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). Reasonable suspicion does not exist solely on the basis of an officer's hunch; rather, to satisfy the Fourth Amendment, the officer must be able to articulate some minimal, objective justification for a *Terry* stop. *See United States v. Walker*, 494 F.3d 688, 691 (8th Cir.2007).

■ When deciding whether reasonable suspicion sufficient to justify a *Terry* stop existed, the court looks at the totality of the circumstances. *See United States v. Gilliam*, 520 F.3d 844, 846 (8th Cir.2008). Police officers may rely on information from other officers in making a *Terry* stop. *See United States v. Navarrete–Barron*, 192 F.3d 786, 790 (8th Cir.1999). "To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, —— U.S. ——, 129 S.Ct. 781, 784, 172 L.Ed.2d 694 (2009).

■ Officer Purcell was actively pursuing Shipp based on Shipp's outstanding warrants. Officer Purcell had questioned the motel desk clerk about Shipp and later received a phone call as a result of his investigation informing him that the desk clerk had observed a woman matching Shipp's photograph leaving the hotel in a taxicab, accompanied by a male companion. This information and Shipp's outstanding warrants provided law enforcement with a valid reason to stop the taxicab. Additionally, as Officer Purcell and Deputy Hedgecock both testified,

they had prior knowledge that Shipp was likely to be in the company of one or more male associates, Nicholson and Defendant, both of whom had outstanding warrants for their arrest. Deputy Hedgecock testified that he had been alerted that Shipp, Nicholson, and Defendant were possibly in possession of weapons. Officer Purcell alerted Deputy Hedgecock that after seeing Officer Purcell's squad car, Shipp turned and said something to Defendant, causing Defendant to slump down in his seat and behave suspiciously. Deputy Hedgecock further testified that when he ordered Defendant to show his hands, Defendant was slumped over in his seat and initially responded by only showing one hand. Defendant did not show his second hand until after further orders from the police. The totality of the circumstances known to the police officers at the time created reasonable suspicion to justify a *Terry* stop, including the officers' actions of detaining Defendant, patting him down, and inquiring as to his identity. *See United States v. Suitt*, 569 F.3d 867, 870–71 (8th Cir.2009) (finding that reasonable suspicion existed where the defendant made several hesitant, evasive, and incomplete responses to questions asked during a routine traffic stop); *United States v. Griffith*, 533 F.3d 979, 983–84 (8th Cir.2008) (finding reasonable suspicion to justify detaining the defendant, a passenger in a car, to ascertain his identity where the driver became agitated in response to law enforcement's questioning and refused to identify the defendant, and where the defendant himself reached under the front seat of the car when officers approached him for questioning).

## B. Search and Seizure of the Defendant's Gym Bag

Defendant claims that Deputy Hedgecock conducted an illegal search and seizure by removing the gym bag from the taxicab. The Government defends on the basis that Deputy Hedgecock was authorized either (1) to search the gym bag as part of the *Terry* stop and as part of a search incident to arrest, or (2) to seize the gym bag, which resulted in exposing contraband to plain view.

### 1. Search analysis

██ "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption ... that the exigencies of the situation made that course imperative." *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (quotation and footnote omitted). Exceptions to the warrant requirement include a search incident to a lawful arrest, *Gant*, 129 S.Ct. at 1716, and a *Terry* stop, *Terry*, 392 U.S. at 22, 88 S.Ct. 1868.

██ The scope of both a *Terry* search and a search incident to arrest, however, is now limited to (1) searches addressing concerns of officer safety, *see Gant*, 129 S.Ct. at 1716 ("[A] search incident to arrest may only include the arrestee's person and ... the area from within which he might gain possession of a weapon.'... That limitation ... ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers." (internal quotation marks and citation omitted)); *Adams*, 407 U.S. at 146, 92 S.Ct. 1921 ("The purpose of this ... [*Terry*] search is not to discover evidence of crime, but to allow the officer to pursue his investigation without

fear of violence."), and (2) in the case of searches incident to arrest, searches where it is "reasonable to believe evidence relevant to the crime of arrest might be found," *Gant,* 129 S.Ct. at 1719 (quoting *Thornton v. United States,* 541 U.S. 615, 632, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004) (Scalia, J., concurring in judgment)); *see also United States v. Davis,* 569 F.3d 813, 816–17 (8th Cir.2009). In the case of a traffic stop, concerns of officer safety justify a search of the vehicle only when the suspect "is unsecured and within reaching distance of the passenger compartment at the time of the search." *Gant,* 129 S.Ct. at 1719.

██ Here, Defendant was handcuffed behind his back, leaning against the rear bumper of the taxicab, while surrounded by three law enforcement officers. Deputy Shepherd testified that Defendant was under control at the time Deputy Hedgecock removed the gym bag from the taxicab. Defendant had no ability to access the interior of the taxicab, much less the contents of the gym bag. Shipp, too, was in custody and had been placed in the back of Officer Purcell's squad car. The Government produced no testimony either that the taxicab driver was a suspect or that the officers felt the need to secure the gym bag on his account. The law enforcement officers did not testify that the gym bag was itself of such "incriminating character to be immediately apparent" that it contained contraband. *Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). Consequently, the bag presented no concerns for officer safety that would justify a *Terry* search of the bag's contents. *See Gant,* 129 S.Ct. at 1719; *United States v. Lopez,* 567 F.3d 755 (6th Cir.2009).

Defendant was not under arrest at the time Deputy Hedgecock removed the gym bag from the taxicab. It was not until Officer Purcell performed a warrant check on Defendant, and discovered that Defendant had an outstanding warrant in Polk County for a probation violation, that Defendant was placed under arrest. Furthermore, even if Defendant had been under arrest at the time Deputy Hedgecock removed the gym bag, the law enforcement officers could not have reasonably "believe[d] evidence relevant to the crime of arrest might be found in the vehicle," and therefore the search incident to arrest exception would not apply. *Gant,* 129 S.Ct. at 1719; *see Lopez,* 567 F.3d 755 ("There was no reason to think that the vehicle contained evidence of the offense of arrest, since that offense was reckless driving."); *United States v. Majette,* No. 08–4427, 2009 WL 1154270, at *2 (4th Cir. Apr.30, 2009) (finding that, where the crime of arrest was driving with a suspended license, the arresting law enforcement officer would not have had a reasonable basis to believe he would find evidence of the crime of arrest by searching the defendant's car). *But see Davis,* 569 F.3d at 816–18 (concluding the law enforcement officer's warrantless search of the defendant's vehicle fell within the search incident to arrest exception where, at the time of the search, the officer had already discovered marijuana in the defendant's pocket and placed defendant in custody). Consequently, Deputy Hedgecock had no basis upon which to search the gym bag and therefore was not justified in removing it or disturbing its contents.

### 2. Seizure Analysis

In the alternative, the Government argues that when Deputy Hedgecock pulled the gym bag toward him, the top, unzipped pocket sprang open and revealed the presence of drug paraphernalia in plain view, giving the officers probable cause to believe that there was additional evidence of

that crime within the gym bag.[4] Defendant argues that by moving the gym bag, Deputy Hedgecock effectuated an illegal seizure of the gym bag and its contents.

### a. Whether the gym bag was seized

 "The Fourth Amendment protects against both unreasonable searches and unreasonable seizures. Not surprisingly, the Supreme Court has recognized the Search Clause is wholly distinct from the Seizure Clause, such that courts applying these clauses must understand they provide different protections against government conduct." *United States v. Va Lerie*, 424 F.3d 694, 701 (8th Cir.2005) (en banc). Unlike a Fourth Amendment search, which "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed," *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), "a Fourth Amendment seizure of property 'occurs when there is some meaningful interference with an individual's possessory interests in that property,'" *Va Lerie*, 424 F.3d at 701 (citing *Jacobsen*, 466 U.S. at 113, 104 S.Ct. 1652). Because the seizure standard only applies to *meaningful* interferences with an individual's possessory interests in property, "[i]t necessarily follows that not every governmental interference with a person's property constitutes a seizure of that property under the Constitution." *Id.* at 702. Consequently, "the seizure standard prohibits the government's *conversion* of an individual's private property, as opposed to the mere *technical*

*trespass* to an individual's private property." [5] *Id.* (emphasis added).

 The threshold question, then, is whether Deputy Hedgecock meaningfully interfered with Defendant's possessory interests in the gym bag when he removed it from the taxicab. The Supreme Court has noted that removal of an individual's luggage to another location constitutes a "substantial intrusion on [the individual's] possessory interests." *United States v. Place*, 462 U.S. 696, 710 n. 9, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (finding that law enforcement officers' removal of luggage within the defendant's immediate possession from one airport to another airport in order to subject the luggage to a "sniff test" by a trained narcotics detection dog constituted a seizure). The argument that a meaningful interference can result from moving an individual's luggage without his consent is further bolstered in light of *United States v. Alvarez–Manzo*, 570 F.3d 1070, 1074–77 (8th Cir.2009), a recent Eighth Circuit case, wherein the court concluded that a seizure occurred when law enforcement officers removed a suitcase from the lower storage area of a commercial passenger bus and brought it into the passenger cabin of the bus in order to ascertain the whereabouts of the suitcase's owner. In *Alvarez–Manzo*, the court reasoned that merely moving the luggage deprived a common carrier of the possessory interest it had obtained through its status as bailee of the checked luggage; the court did not concern itself with where the lug-

---

**4.** Evidence that is in plain view may be seized without a warrant if the following three conditions are met: "(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself." *United States v. Armstrong*, 554 F.3d 1159, 1162–63 (8th Cir.2009) (citations and quotation marks omitted).

**5.** The *Va Lerie* court explained the difference between the torts of conversion and trespass by stating "the tort of conversion differs from the tort of trespass in that conversion requires 'an intent to exercise a dominion or control over the goods which is in fact inconsistent with the owner's rights.'" *Va Lerie*, 424 F.3d at 703 (quoting W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 15 at 92, 102 (5th ed.1984)).

gage was being taken but rather focused solely on whether the bailee-common carrier had authorized the movement. *Id.*

This is not a common carrier case in the variety of *Va Lerie* or *Alvarez–Manzo.* While the bag was in a public transportation vehicle, it was never provided to the taxi driver as a bailee but remained in Defendant's immediate possession until he was removed from the taxi. Whether the bag was zippered shut or folded over, Defendant had an expectation of privacy in the bag. At no time did Defendant give Deputy Hedgecock permission to move the gym bag from its location in the back of the taxicab. When Deputy Hedgecock pulled the bag toward him, he effected a meaningful intrusion on Defendant's possessory interests in the gym bag. Consequently, the gym bag was seized within the meaning of the Fourth Amendment.

### b. Whether the Seizure was Justified

 The Fourth Amendment protects the "right of the people to be secure in their ... effects ... against unreasonable ... seizures." U.S. Const. amend IV. "[A] seizure of personal property [is] per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *Place,* 462 U.S. at 701, 103 S.Ct. 2637. However, because the Fourth Amendment prohibits only "unreasonable" seizures, the Supreme Court has recognized there are instances where the interests of society outweigh the individual's right to be free from the government's unauthorized exercise of dominion over his private property. *Id.* at 701–03, 103 S.Ct. 2637. For instance, if "law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but

have not secured a warrant," seizure of the property is permitted "pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *Id.* at 701, 103 S.Ct. 2637.

 The Supreme Court has recognized that, in the present context, a seizure is reasonable when it is supported by reasonable suspicion. *Id.* at 703, 103 S.Ct. 2637. Concerning personal effects, as opposed to other forms of private property such as real estate, the Supreme Court has stated,

> The intrusion on possessory interests occasioned by a seizure of one's personal effects can vary both in its nature and extent.... Given the fact that seizures of property can vary in intrusiveness, some brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime.

*Id.* at 708–09, 103 S.Ct. 2637. "[W]hen the police seize luggage from [a] suspect's custody, ... the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause." *Id.* Therefore, the seizure of a traveler's luggage for investigatory purposes must be supported by a reasonable belief, based on specific and articulable facts, that it contains contraband. *Id.* at 703, 103 S.Ct. 2637; *see also United States v. Zacher,* 465 F.3d 336, 338 (8th Cir.2006) ("A law enforcement officer must have reasonable suspicion before he or she may seize a package for investigatory purposes."); *United States v. Moore,* 22 F.3d 241 (10th Cir.1994) (finding the seizure of the defendant's duffel bag was justified by reasonable suspicion).[6]

---

**6.** The Government makes no argument, and

the record does not support, a conclusion that

The Government has not challenged the fact that, at the time Deputy Hedgecock moved the gym bag, the bag was still in Defendant's possession. The Government has presented no evidence that prior to seizing the gym bag, Deputy Hedgecock possessed any specific, articulable facts or knowledge sufficient to give him a reasonable belief that the gym bag contained contraband. Consequently, the Court finds that the gym bag was illegally seized in violation of Defendant's Fourth Amendment rights.

### c. Inevitable Discovery

 The Government also argues that, if the Court finds the seizure was illegal, the evidence should not be suppressed because the physical evidence—the glass "crank" pipe—would have inevitably been discovered upon Defendant's arrest and incarceration for his outstanding warrants. The Government argues that, as Defendant's personal possession at the time of his arrest, the gym bag would have been removed from the taxicab in order to keep it with Defendant and consequently that the gym bag would have been opened and the contents would have become visible at that time. "The inevitable discovery doctrine posits that if the prosecution can establish by a preponderance of the evidence that the information, otherwise to be suppressed under the exclusionary rule, ultimately or inevitably would have been discovered by lawful means, then the exclusionary rule does not apply." *United States v. James,* 353 F.3d 606, 616–17 (8th Cir.2003) (citing *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). The Eighth Circuit

has articulated the standards for inevitable discovery as follows:

> The test for inevitable discovery ... includes two elements. First, there must be an ongoing line of investigation that is distinct from the impermissible or unlawful technique. Second, there must be a showing of a reasonable probability that the permissible line of investigation would have led to the independent discovery of the evidence. The required standard of proof on this evidentiary issue is a simple preponderance of the evidence, not proof beyond a reasonable doubt.

*United States v. Villalba–Alvarado,* 345 F.3d 1007, 1019–20 (8th Cir.2003).

While investigation of the Defendant's warrants suffices to meet the first element, the Government provided no specific record of police practices—such as testimony that every arrestee's personal possessions are maintained with the person and subject to an inventory search before being stored at the jail—that would afford a reasonable basis for the Court to find that the mere fact of Defendant's arrest would result in the removal of his effects from the taxicab. *Id.* (refusing to find inevitable discovery where the Government presented "no ... testimony concerning specific details ... of the search or the intentions or definite plans of the searchers").[7] Thus, the Court finds the doctrine of inevitable discovery to be unsupported in the present case.

### 3. Good–Faith Exception to the Exclusionary Rule

The Government also argues that the "good-faith exception" to the exclusionary

---

any seizure of the bag by Officer Hedgecock at this point in the process was not for investigatory purposes but merely to keep the property and the owner together.

7. Because this record clearly reveals the Defendant never abandoned the bag nor consented to a search, the Court finds the Government's reliance on *United States v. Perea* unhelpful. *See United States v. Perea,* 986 F.2d 633, 645 (2nd Cir.1993).

rule established in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), should apply because law enforcement officers were operating in good faith reliance on the law as it existed prior to *Gant.* The Eighth Circuit has noted without deciding the application of this doctrine in the recent case of *United States v. Hrasky,* 567 F.3d 367, 369 (8th Cir.2009) (noting that the government had not argued that the good-faith exception to the exclusionary rule should apply, and expressing "no view on whether good-faith reliance on [*New York v.] Belton,* [453 U.S. 454, 101 S.Ct. 2860 (1981) ], would justify an exception to the exclusionary rule").

 In this case, application of the good-faith exception to the exclusionary rule would mean that, if the officers conducted a valid search incident-to-arrest or officer-safety search as those terms were understood prior to *Gant,* the evidence would not be suppressed. "[T]he prime purpose of the exclusionary rule is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *Illinois v. Krull,* 480 U.S. 340, 347, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (internal quotation marks and citation omitted). The exclusionary rule only applies in situations that advance its remedial purpose; determining when that is involves "examin[ing] whether the rule's deterrent effect will be achieved, and weigh[ing] the likelihood of such deterrence against the costs of withholding reliable information from the truth-seeking process." *Id.*

The good-faith exception to the exclusionary rule has only been applied in two contexts: searches based on a defective warrant as recognized in *United States v. Leon,* 468 U.S. at 920, 104 S.Ct. 3405, and searches based on an unconstitutional state statute as recognized in *Illinois v. Krull,* 480 U.S. at 340, 107 S.Ct. 1160.

In *Leon,* the defendants were arrested after police executed a search warrant that was facially valid but which the district court later determined had not been issued upon probable cause. *Leon,* 468 U.S. at 903, 104 S.Ct. 3405. The government argued that, although the warrant did not meet the requirements of the Fourth Amendment, the evidence gathered from the search of the defendants' house should still be admitted because the officers were acting in good faith. *Id.*

In reviewing the rule's scope, the *Leon* court noted that the exclusionary rule "operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" *Id.* at 906, 104 S.Ct. 3405 (quoting *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)). Because of the exclusionary rule's "objectionable collateral consequences," including the fact that "some guilty defendants may go free or receive reduced sentences as a result of favorable plea bargains," the Court noted that the rule should only apply in situations where its deterrent, remedial objectives are best served. *Id.* at 907, 104 S.Ct. 3405.

The standard the *Leon* court established for determining whether to apply the exclusionary rule was whether law enforcement officers' reliance on a legal determination, i.e. a judge's ruling that there existed probable cause to issue a warrant, was "objectively reasonable." *Id.* In making this ruling, the Court noted that the magistrate judge, the source of the legal determination upon which the officers relied, was independent from law enforcement. *Id.* at 917, 104 S.Ct. 3405 ("Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial

officers, they have no stake in the outcome of particular criminal prosecutions.")

The *Leon* court conducted a cost-benefit analysis and made its decision based on the following three factors:

First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion. Third, and most important, [the Court] discern[ed] no basis, and [was] offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate.

*Id.* at 916, 104 S.Ct. 3405. The Court ultimately "conclude[d] that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 922, 104 S.Ct. 3405.

*Krull* involved a state administrative statute that required licensed motor vehicle and vehicular parts sellers to allow inspections of certain required records by state officials at any reasonable time of night or day. *Krull,* 480 U.S. at 343, 107 S.Ct. 1160. A detective went to an automobile wrecking yard and demanded, by authority of Ill.Rev.Stat., ch. 95 1/2, paras. 5–100 to 5–801 (1985) (the Illinois statute), to see the wrecking yard's record of vehicle purchases. *Id.* When the wrecking yard's management produced an incomplete record, the detective exercised his authority under the Illinois statute to examine the premises to determine the record's accuracy. *Id.* Upon doing so, the detective ascertained that three vehicles in the yard were stolen and a fourth had its identification number removed. *Id.* After being arrested, the yard management challenged the search, claiming it violated the Fourth Amendment. *Id.* at 344–46, 107 S.Ct. 1160. The state court granted the defendants' motion to suppress, reasoning (1) the statute, as it existed at the time, was unconstitutional, and (2) good-faith reliance on the statute could not justify admission of the evidence under the exclusionary rule. *Id.* at 345–46, 107 S.Ct. 1160.

The Court granted certiorari and held, using the three part balancing test established in *Leon,* that under the good-faith exception to the exclusionary rule, the evidence should not be excluded, even though the statute violated the Fourth Amendment. *Id.* at 359–60, 107 S.Ct. 1160. The *Krull* Court noted that the only differences between *Krull* and *Leon* was "the effect of the exclusion of evidence on judicial officers and the effect of the exclusion of evidence on legislators." *Id.* at 350, 107 S.Ct. 1160. Concerning the first element of the *Leon* balancing analysis, the Court found that "[a]lthough legislators are not 'neutral judicial officers,' as are judges and magistrates, neither are they 'adjuncts to the law enforcement team.'" *Id.* at 350–51, 107 S.Ct. 1160 (quoting *Leon,* 468 U.S. at 916, 104 S.Ct. 3405 (internal citations omitted)). Similarly, under the second *Leon* element, the Court found "no evidence suggesting that Congress or state legislatures have enacted a significant number of statutes permitting warrantless administrative searches violative of the Fourth Amendment." *Id.* at 351, 107 S.Ct. 1160. As concerned the third element, the *Krull* Court found that "[t]he application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant." *Id.* at

349, 107 S.Ct. 1160. After balancing the three factors, the Court found that the exclusionary rule should not apply. *Id.* at 356–57, 107 S.Ct. 1160.

The Government claims that Deputy Hedgecock, in conducting his search, was acting in objective good-faith reliance on the case law of numerous circuit courts, including the Eighth Circuit, that were reversed by the Supreme Court's decision in *Gant.* Therefore, in determining whether to apply the exclusionary rule to the facts in this present case, the Court will conduct the three-part balancing analysis.

The source of the relied-upon law, as in *Leon,* is judicial officers, pursuant to whose opinions and caselaw Deputy Hedgecock allegedly operated. Consequently, the three-part balancing analysis is essentially unchanged from *Leon.* Judicial officers are not the individuals whose conduct the exclusionary rule is designed to deter. *See Leon,* 468 U.S. at 916, 104 S.Ct. 3405 ("[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates."); *see also Krull,* 480 U.S. at 350, 107 S.Ct. 1160 ("[J]udicial officers . . . are not the focus of the [exclusionary] rule."). Under the second element, again as in *Leon,* there exists "no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion." *Leon,* 468 U.S. at 916, 104 S.Ct. 3405. Finally, as concerns the third element, this Court is similarly unable to "discern [a] basis . . . for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate." *Id.; see Krull,* 480 U.S. at 349, 107 S.Ct. 1160.

If law enforcement has acted pursuant to policies and procedures arising from an accurate understanding of then-existing doctrine, what wrongful conduct on the part of the police has occurred? Surely the imposition of the exclusionary rule cannot be logically utilized to deter the future conduct of law enforcement proceeding pursuant to an accurate understanding of the law post-*Gant.* Suppression of such evidence is a high price with no corresponding benefit.

■ Consequently, the Court holds that a law enforcement officer's objective, good-faith reliance on doctrine derived from case law does not warrant application of the exclusionary rule.[8] *See United States v. Grote,* 2009 WL 2068023, **3–4, 2009 U.S. Dist. LEXIS 60893, at *9–11 (E.D.Wash. July 15, 2009) (finding the good-faith exception applied to law enforcement officers who had performed a search incident to arrest in objective, good-faith reliance on the cases preceding *Gant); see also United States v. Herrera,* 444 F.3d 1238, 1253 (10th Cir.2006) (suggesting that the good-faith exception could apply to some warrantless searches, although not "when the mistake resulting in the Fourth Amendment violation is that of the officer conducting the seizure and search, rather than a neutral third party not engaged in the 'competitive endeavor of ferreting out crime.' ") (quoting *Leon,* 468 U.S. at 914, 104 S.Ct. 3405). *But see*

8. This Court notes, as did the courts in *Leon* and *Krull,* that the exclusionary rule may still be applied when law enforcement officers rely on case law in which the ruling judges "wholly abandoned" their responsibilities to rule in a manner that upholds the Constitution. *Krull,* 480 U.S. at 355, 107 S.Ct. 1160; *Leon,* 468 U.S. at 923, 104 S.Ct. 3405. A law enforcement officer cannot be said to have relied in good faith upon case law which abandons adherence to precedent and/or the applicable text such that it reaches a result "that a reasonable officer should have known was unconstitutional." *Krull,* 480 U.S. at 355, 107 S.Ct. 1160.

*United States v. Winsor,* 846 F.2d 1569, 1579 (9th Cir.1988) (en banc) (holding that the good-faith exception only applies "to searches conducted in good faith reliance on a warrant or a statute later declared to be unconstitutional"); *Arizona v. Evans,* 514 U.S. 1, 18, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) ("The reasoning in *Leon* assumed the existence of a warrant; it was, and remains, wholly inapplicable to warrantless searches and seizures.") (Stevens, J., dissenting); *United States v. Curzi,* 867 F.2d 36, 44 (1st Cir.1989) ("[T]his court has not recognized a good-faith exception in respect to warrantless searches."); *United States v. Morgan,* 743 F.2d 1158, 1165 (6th Cir.1984) (concluding that *Leon* is inapplicable where officers do not have a warrant, even when the government argues the existence of "exigent circumstances"). In the present case, at the time of the search, the Supreme Court's decision in *Belton* "was widely understood to allow a vehicle search incident to the arrest of a recent occupant even if there is no possibility the arrestee could gain access to the vehicle at the time of the search." *Gant,* 129 S.Ct. at 1718.

The Eighth Circuit had observed that "a search [incident to arrest] need not be conducted immediately upon the heels of an arrest, but sometimes may be conducted well after the arrest, so long as it occurs during a continuous sequence of events." *United States v. Hrasky,* 453 F.3d 1099, 1102 (8th Cir.2006) (finding an automobile search that began an hour after the defendant was arrested was a valid search incident to arrest); *see United States v. Grooms,* 506 F.3d 1088, 1091 (8th Cir.2007) (finding a valid search incident to arrest where the defendant's automobile was searched eight minutes after the defendant's arrest); *see also United States v. Ball,* 499 F.3d 890, 896 (8th Cir.2007); *United States v. Jones,* 479 F.3d 975, 978 (8th Cir.2007).

■ The Court finds that Deputy Hedgecock's actions did not meet the standards for a valid search incident to Defendant's arrest under the standard articulated by the Eighth Circuit prior to *Gant,* i.e. that "in the case of a full custodial arrest of an 'occupant' or 'recent occupant' of a vehicle, the police may search the passenger compartment of the vehicle as 'a contemporaneous incident' of that arrest." *Hrasky,* 453 F.3d at 1101. At the time Deputy Hedgecock grabbed the gym bag, Defendant was merely being detained, as Officer Purcell had not yet performed a check to ascertain whether Defendant had any outstanding warrants for his arrest. Since a search incident to arrest may only be conducted after a suspect has been arrested, *see United States v. Rowland,* 341 F.3d 774, 783 (8th Cir. 2003) ("Because [the defendant] was not arrested, law enforcement could not have conducted a search incident to arrest pursuant to [*Belton*]."); *United States v. Wells,* 347 F.3d 280, 287 (8th Cir.2003) ("Once [the defendant] was arrested, law enforcement was authorized to conduct a search incident to the arrest."), and Defendant was not under arrest at the time the search occurred, the search was not justified as a search incident to arrest under the case law as it existed prior to *Gant. See Hrasky,* 453 F.3d at 1102; *Wells,* 347 F.3d at 287.

■ Deputy Hedgecock's search of the bag was, however, a valid search incident to Shipp's arrest under the Eighth Circuit case law existing prior to *Gant.* Under the pre-*Gant* law, Eighth Circuit caselaw "upheld searches of automobiles incident to arrest where the arrestee ha[d] exited the vehicle and has been handcuffed and placed in a police officer's patrol car." *Hrasky,* 453 F.3d at 1101 (citing *United States v. Barnes,* 374 F.3d 601, 603 (8th Cir.2004)). Though Shipp had exited the

vehicle, had been handcuffed, and had been placed in the back of Officer Purcell's squad car, no more than four minutes had elapsed from the time Shipp exited the vehicle to the time Deputy Hedgecock inspected the gym bag. Such a flow of events falls well within the time periods upheld in other cases, *see id.* at 1102; *Grooms,* 506 F.3d at 1091, and constituted a contemporaneous incident of Shipp's arrest. The Court consequently finds that Deputy Hedgecock made a search of the gym bag incident to Shipp's arrest that adhered to and was made in objectively reasonable reliance upon the Eighth Circuit doctrine controlling at the time. Therefore, the Court holds that the exclusionary rule does not apply and denies Defendant's motion to suppress the gym bag and its contents.

## C. Suppression of Incriminating Statements as Violating Defendant's *Miranda* Rights

 Defendant argues that he was not advised of his *Miranda* rights prior to making his statements admitting ownership of the gym bag, and therefore his statements should be suppressed. To protect a suspect's Fifth Amendment right not to be "compelled in any criminal case to be a witness against himself," applicable to the states through the Due Process Clause of the Fourteenth Amendment, the U.S. Supreme Court in *Miranda,* 384 U.S. at 479, 86 S.Ct. 1602, held that a person subject to custodial interrogation must be informed of the right to remain silent, that any statement made could be used against the suspect, and the person must be informed of the right to counsel and that counsel can be appointed before any questioning. *"Miranda* warnings are not required for '[g]eneral on-the-scene questioning as to facts surrounding a crime,' which does not present 'the compelling atmosphere inherent in the process of in-custody interrogation.'" *United States v.*

*Howard,* 532 F.3d 755, 761 (8th Cir.2008) (quoting *Miranda,* 384 U.S. at 477–78, 86 S.Ct. 1602).

The Eighth Circuit has established a two-prong test to determine when statements made in the absence of *Miranda* warnings must be suppressed: (1) whether the statements were made while the defendant was in custody, and (2) whether the suspect made the statements in response to interrogation. *See Howard,* 532 F.3d at 761 ("In order for a [d]efendant's *Miranda* rights to apply the individual must be in custody and being interrogated.").

 The first prong is whether Defendant was in custody when he made the incriminating statement. An individual is in custody for purposes of *Miranda* when "(1) the person has been formally arrested, or (2) the person's freedom of movement has been restrained to a degree associated with a formal arrest." *United States v. Martinez,* 462 F.3d 903, 909 (8th Cir.2006). "The critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's freedom to depart was restricted in any way." *Id.* In determining whether the suspect was in custody, the Court considers the totality of the circumstances, "keeping in mind that the determination is based on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id.*

The Eighth Circuit has developed a list of six "common, but non-exhaustive indicia" to determine whether an individual is in custody:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether

the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning. In applying these indicia [the court] employ[s] a balancing test. The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody.

*United States v. Wolk,* 337 F.3d 997, 1006 (8th Cir.2003) (*citing United States v. Wallace,* 323 F.3d 1109, 1112 (8th Cir.2003)).

 The mitigating factors suggest Defendant was in custody at the time he was questioned by Deputy Hedgecock. At no time did law enforcement officers inform Defendant that he was free to leave or not considered under arrest. At the time Deputy Hedgecock asked whether Defendant owned the bag, Defendant had just been forcibly removed from the taxicab, his hands were cuffed behind his back, and he was leaned up against the rear bumper of the taxicab. Accepting the officers' testimony that Defendant had not yet been arrested but was merely being detained, it is certain that Defendant's freedom was restricted to a degree associated with a formal arrest, and he had not been informed that he was free to leave. Finally, Defendant did not initiate the contact with authorities; rather, contact was initiated when Officer Purcell pulled over the taxicab.

In addition, two of the three aggravating factors are present. The atmosphere of the questioning was definitely police dominated: (1) Defendant was handcuffed, leaned up against a taxi on the side of the interstate highway and surrounded by at least two law enforcement officials; and (2) at the end of the interrogation, Defendant was placed under arrest. Weighing the indicia, the Court concludes that Defendant was in custody for purposes of the *Miranda* analysis.

 The second prong is whether Defendant was subject to interrogation. "An interrogation includes both direct questions and words or actions that officers should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. McGlothen,* 556 F.3d 698, 701 (8th Cir.2009) (quotation marks and citation omitted). "Determining whether particular statements or practices amount to interrogation depends on the circumstances of each case, particularly whether the statements are objectively and reasonably likely to result in incriminating responses by the suspect, as well as the nature of the police statements and the context in which they are given." *United States v. Hephner,* 103 Fed.Appx. 41, 49 (8th Cir.2004) (unpublished).

 Deputy Hedgecock's inquiry as to whether Defendant owned the gym bag was a direct question. The Eighth Circuit, however, has opined that a law enforcement officer's direct question may not rise to the level of an interrogation when it is not investigatory in nature. In *United States v. Fleck,* police asked the two co-defendants to provide a key to a bedroom in a house they jointly owned. *United States v. Fleck,* 413 F.3d 883, 892 (8th Cir.2005). The Eighth Circuit ruled that the question was not an interrogation because

"Though the officers asked a direct question of the [defendants] regarding the key to the bedroom, it was not the

kind of investigative questioning—intended to elicit an incriminating response—that was at issue in *Miranda*. Nothing further regarding authority over the bedroom—and hence ownership of or authority over the guns found in it—was admitted by [one of the defendants] in producing the key since the [defendants] had already told the officers they were coowners of the entire house."

*Fleck*, 413 F.3d at 892 n. 2.

Unlike the situation in *Fleck*, however, neither Shipp nor Defendant had volunteered any statements about ownership of the gym bag prior to Deputy Hedgecock's questioning. Deputy Hedgecock had already observed the glass pipe inside the gym bag, and he had a reasonable belief that the bag contained contraband based on his training and experience in drug trafficking enforcement. Deputy Hedgecock's query was investigative and was intended to determine to whom the gym bag and the drug paraphernalia therein belonged. Therefore, Deputy Hedgecock's direct question constituted an interrogation. *See McGlothen*, 556 F.3d at 701.

Defendant's statements admitting ownership of the gym bag were therefore the result of a custodial interrogation, prior to which Defendant should have been, but was not, advised of his *Miranda* rights. Consequently, Defendant's statement admitting ownership of the gym bag is suppressed.[9]

9. Defendant argues that his statements admitting ownership of the gym bag also resulted from an illegal search and should be suppressed under the exclusionary rule. *See United States v. Swope*, 542 F.3d 609, 613 (8th Cir.2008) (holding that the exclusionary rule "reaches not only primary evidence obtained as a direct result of an illegal search or seizure ... but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree" (quoting *Segura v. United States*, 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984))). However, in view of the Court's ruling suppressing Defendant's statements made in the absence of *Miranda* warnings, the Court need not resolve Defendant's fruit of the poisonous tree argument.

## III. CONCLUSION

For the reasons stated above, Defendant's Motion to Suppress (Clerk's No. 46) is **granted** as to his statement admitting ownership of the gym bag and **denied** as to the gym bag and the contents therein.

**IT IS SO ORDERED.**