UNITED STATES, Appellant,

v.

Lorenzo Ali **DEBRUHL,** Appellee.

No. 09–CO–1208.

District of Columbia Court of Appeals.

Argued Feb. 4, 2010.

Decided April 22, 2010.

Roy W. McLeese III, Assistant United States Attorney, with whom Channing D. Phillips, Acting United States Attorney, and Lara Worm, and Ann K.H. Simon, Assistant United States Attorneys, were on the brief, for appellant.

Thomas W. Farquhar for appellee.

Chris Kemmitt, Public Defender Service, with whom James Klein, Samia Fam, and Corinne Beckwith, Public Defender Service, were on the brief for amicus curiae Public Defender Service.

Before REID and KRAMER, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

This case presents the question whether the federal "exclusionary rule" should be applied retroactively to a pending case after the Supreme Court has issued a decision expanding Fourth Amendment protection that would benefit the defendant if the rule applies.

At the time of appellee Debruhl's arrest for a traffic violation, *New York v. Belton*,[1] as commonly interpreted, allowed the police to search the passenger compartment of an automobile without a warrant, and virtually without restriction, when incident to a lawful arrest. Before Debruhl's trial, however, in *Arizona v. Gant*,[2] the Supreme Court narrowed *Belton* by precluding warrantless searches of an automobile after the occupants had been removed and secured with handcuffs, and thus no longer remained a threat to police safety or to preservation of evidence. The parties agree that *Gant's* revised interpretation of the Fourth Amendment applies retroactively to all cases "not yet final."[3] Therefore, because Debruhl, like Gant, had been removed from his car and handcuffed before the arresting officers conducted their search, it is undisputed that the search of Debruhl's car was unconstitutional. As a consequence, argues Debruhl, the evidence seized from his car—cocaine and related drug paraphernalia—must be suppressed under the traditional exclusionary rule.

To the contrary, says the government, the evidence is admissible under the "good-faith" exception to the exclusionary rule because of the officers' reasonable,

objective reliance on "settled law"—on the *Belton* line of cases—while conducting their search before *Gant* was decided. We cannot agree. As interpreted in this jurisdiction and in several federal circuits, *Belton* did not reflect "settled law" on which police officers could reasonably rely in conducting the warrantless search on the facts of this case. We therefore agree with the trial court's decision to reject the good-faith exception and suppress the evidence seized from Debruhl's car. Accordingly, we affirm.

## I. FACTS AND PROCEEDINGS

On January 11, 2009, Metropolitan Police Department officers observed appellee Lorenzo Ali Debruhl driving an Oldsmobile with its lights off between 1:00 and 2:00 a.m. in the 900 block of Hamilton Street, N.E. Officers Cepeda and Eglund decided to conduct a traffic stop of the car and ran a check of its license plate. While the officers were asking for Debruhl's driver's license and registration, their inquiry on the license plate came back showing no record or listing for the tags. Upon checking the registration provided by Debruhl, the officers found that it matched the license plate but not the car. A subsequent check of the vehicle identification number revealed that the car was unregistered. Officer Eglund asked Debruhl to step out of the car, placed him under arrest, then handcuffed him. Debruhl was escorted by Officer Cepeda to a spot behind the car while Officer Eglund searched the passenger compartment. During the search, the officer recovered a brown paper bag from under the driver's seat. Inside the bag were a pair of gloves, a digital scale, razor blades, an unspecified amount

---

1. 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

2. —— U.S. ——, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009).

3. *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

of currency, and "a clear plastic bag containing a white rock substance" that field-tested positive for cocaine.

A grand jury indicted Debruhl on one count of possession of a controlled substance with intent to distribute,[4] and one count of possession of drug paraphernalia.[5] Before trial, Debruhl filed a motion to suppress the drugs and drug paraphernalia, and the motion was heard on September 11, 2009. Although the trial court credited the testimony of Officer Cepeda that the search had been made incident to Debruhl's arrest, the court inquired of counsel whether the Supreme Court's recent *Gant* decision required it to suppress the evidence as the product of a search that violated the Fourth Amendment.

The *Gant* case grew out of the search of a car incident to an arrest for a traffic offense on August 25, 1999.[6] The suspect, Gant, had been handcuffed and secured in a squad car while the police searched his car and located a bag of cocaine in the pocket of a jacket on the back seat.[7] Gant filed a motion to suppress the evidence, arguing that the search was unauthorized under the Fourth Amendment because, being handcuffed and stowed in the squad car, he had not posed a threat to the officers and, further, because his stop for a traffic offense did not authorize a search for evidence.[8] The trial court rejected these arguments, but the Arizona Court of Appeals reversed, suppressing the evidence. The Arizona Supreme Court affirmed the suppression order in an opinion issued on July 25, 2007, stressing that once the scene had been secured, *New York v. Belton* did not justify a search of the car incident to an arrest to protect officer safety or preserve destructible evidence.[9]

Arizona sought review in the United States Supreme Court, which granted certiorari on February 25, 2008. Oral arguments were held on October 7, 2008, and the decision came down on April 21, 2009, little more than three months after Debruhl's arrest and search. In *Gant*, the Supreme Court affirmed the Arizona Supreme Court ruling: with Gant handcuffed and held in the squad car, there had been no risk to police officer safety nor any need to search the car for evidence related to his arrest for a traffic offense. This decision appeared to be at odds with the traditional understanding of the Court's bright-line rule in *Belton*, permitting indiscriminate search of a vehicle's passenger compartment incident to a lawful arrest.

During discussion of Debruhl's suppression motion, the government conceded that *Gant* applied retroactively;[10] Debruhl's Fourth Amendment rights had been violated. The government added, however, that despite the unlawful search, the good-faith exception to the exclusionary rule should apply because the officers had done nothing wrong.[11] They had reasonably relied

---

4. D.C.Code § 48–904.01(a)(1) (2001).

5. D.C.Code § 48–1103(a) (2001).

6. *Gant, supra* note 2, 129 S.Ct. at 1714–15.

7. *Id.* at 1715.

8. *Id.*

9. *Arizona v. Gant,* 216 Ariz. 1, 162 P.3d 640, 646 (2007). The Arizona Supreme Court added: "The State has advanced no alternative theories justifying the warrantless search of Gant's car, and we note that no other exception to the warrant requirement appears to apply." *Id.* The court therefore did not inquire into the good-faith exception to suppression of evidence under the Fourth Amendment exclusionary rule.

10. *See Griffith, supra* note 3, 479 U.S. at 328, 107 S.Ct. 708.

11. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (holding exclusionary rule inapplicable to evidence

on *Belton's* bright-line rule (as interpreted by this court) in conducting the search, and thus suppression of the evidence would not serve the principal purpose of the rule: to deter police misconduct.[12]

After discussion of *Gant* and relevant case law, the trial court ruled that the good-faith exception did not apply, and that the exclusionary rule accordingly survived the government's challenge. The court granted the defense motion and suppressed the evidence of drugs and drug paraphernalia on September 24, 2009. The government then filed this pretrial appeal.[13]

## II. EXCLUSIONARY RULE NOT TIED TO RETROACTIVITY OF FOURTH AMENDMENT RULING

Before addressing the government's argument based on the good-faith exception, we deal briefly with Debruhl's argument—adopted by the trial court—that under Supreme Court authority retroactive applica-

tion of a Fourth Amendment ruling includes application of the exclusionary rule.

Because no one disputes that *Gant's* Fourth Amendment ruling applies retroactively to Debruhl—that is, no one questions that the search of Debruhl's car and seizure of evidence from it were unconstitutional—the exclusionary rule, says Debruhl, is inherent in the Fourth Amendment and flows retroactively as well. To the contrary, replies the government, the exclusionary rule no longer is considered an "essential part"[14]of the Fourth Amendment "right to privacy,"[15] and thus retroactive applicability of the Fourth Amendment does not necessarily imply retroactive application of the exclusionary rule, without exception; these issues are separate.[16]

Debruhl relies primarily on *United States v. Johnson*[17] where the Court applied, retroactively, to a case on direct appeal, the Fourth Amendment rule announced earlier in *Payton v. New York*,[18]

obtained by police officers acting in reasonable reliance on search warrant later held invalid).

**12.** *Id.* at 909, 104 S.Ct. 3405.

**13.** D.C.Code § 23–104(a)(1) (2001).

**14.** *Compare Mapp v. Ohio,* 367 U.S. 643, 649, 657, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) ("[T]he *Weeks[ v. U.S.,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914)] rule is of constitutional origin"; the "exclusionary rule is an essential part of both the Fourth and Fourteenth Amendments.") *with Illinois v. Gates,* 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("The question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.").

**15.** *Mapp, supra* note 14, 367 U.S. at 651, 654, 655, 81 S.Ct. 1684 (1961) (characterizing Fourth Amendment as a "right to privacy");

*United States v. Rabinowitz,* 339 U.S. 56, 66, 70 S.Ct. 430, 94 L.Ed. 653 (1950) (same); *Harris v. United States,* 331 U.S. 145, 150, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947) (same); *Gouled v. United States,* 255 U.S. 298, 304, 41 S.Ct. 261, 65 L.Ed. 647 (1921) (same); *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920) (same).

**16.** *See Gates, supra* note 14, 462 U.S. at 223, 103 S.Ct. 2317.

**17.** 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982).

**18.** 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The Court gave Johnson retroactive benefit of *Payton,* barring warrantless, nonconsensual entry into a suspect's home to make a routine felony arrest. *Payton* had not been decided at the time of Johnson's arrest, but the Court affirmed its retroactive application because, until *Payton,* the law governing warrantless arrests in the home was unsettled; *Payton* was not a "clear" or "sharp" break from past decisions. *Johnson, supra*

and affirmed the reversal of Johnson's conviction and suppression of evidence unlawfully seized from him. The government had offered an "objective" good-faith exception to retroactive application of *Payton*, formulated in a way that the Court characterized as "an absurdity."[19] The government, however, was contending against retroactive application of the Fourth Amendment decision itself, not merely against retroactive application of the exclusionary rule; the government made no effort to separate the exclusion remedy from the Fourth Amendment right.[20] As a result, the defendant received the benefit of the rule without a contest over it, and thus Debruhl cannot claim that *Johnson* necessarily precludes the government from presenting a "good-faith exception" argument for admission of the evidence seized from his car.

*Gant* presents a closer question, as language from both the Court's opinion and the principal dissent suggest that both sides assumed suppression would follow from retroactive application of the Court's decision.[21] That said, none of the opinions in *Gant* expressly acknowledged, let alone addressed, that assumption. We are therefore left to deal with the issue anew in connection with the good-faith exception.

In doing so, it is important to keep in mind that we are considering an "exception." The government does not dispute that, if the good-faith exception is not satisfied, the exclusionary rule will apply to a defendant whose Fourth Amendment rights have been violated, and all unlawfully seized evidence will be suppressed. In short, absent the exception, retroactive application of the Fourth Amendment will include retroactive application of the exclusionary rule as well.

## III. THE "GOOD-FAITH" EXCEPTION

The government argues for the good-faith exception based on the police officers' reliance on the *Belton* line of cases allegedly reflecting "settled law" at the time of Debruhl's arrest. Three central questions are presented: *First,* what exactly is the good-faith exception? *Second,* in what situations does the good-faith exception apply? *Third,* assuming that the good-faith exception could be available here, did the *Belton* line of cases reflect law that was

note 17, 457 U.S. at 553–54, 102 S.Ct. 2579. Later, however, in *Griffith, supra* note 3, the Court abandoned its unwillingness to grant retroactive application to new criminal rules that reflected a "clear break" with the past. The Court held in *Griffith* that "a new rule for the conduct of criminal prosecutions is to be applied retroactively *to all cases,* state or federal, pending on direct review or not yet final, *with no exception* for cases in which the new rule constitutes a 'clear break' with the past" (emphasis added). *Griffith, supra* note 3, 479 U.S. at 328, 107 S.Ct. 708.

19. *Johnson, supra* note 17, 457 U.S. at 560, 102 S.Ct. 2579.

20. The Court in *Johnson* noted: "For the purposes of this case, the Government assumes the correctness of the Court of Appeals' ruling that, if applied to these facts, *Payton* would

require exclusion of respondent's statements.... We therefore need not examine the Court of Appeals' conclusion on that issue." *Id.* at 541 n. 6, 102 S.Ct. 2579.

21. In dissent, Justice Alito warned that "the Court's decision will cause the suppression of evidence gathered in many searches carried out in good-faith reliance on well-settled case law." *Gant, supra* note 2, 129 S.Ct. at 1726. Justice Stevens, writing for the majority, did not disagree with this conclusion but instead noted the limited impact this would have because "the doctrine of qualified immunity will shield officers from liability for searches conducted in reasonable reliance on that understanding." *Id.* at 1722 n. 11. Justice Stevens added that the "reliance interest" at stake did not outweigh "the countervailing interest that all individuals share in having their constitutional rights fully protected." *Id.* at 1723.

"settled" enough to justify reasonable reliance on it by the officers who searched Debruhl's car?

We take up the first question. In *United States v. Leon*,[22] a police officer relied on a search warrant that had been issued by a state Superior Court judge but later was found to have lacked probable cause. The Supreme Court, applying what it called a "good faith" exception[23] to the exclusionary rule, rejected the ruling of the trial court (sustained by the court of appeals) that suppressed the evidence seized. The Court justified admission of the evidence because of the officer's "objectively reasonable" reliance on the subsequently invalidated warrant.[24] Three years later, in *Illinois v. Krull*,[25] the Court extended *Leon's* ruling to a police officer's warrantless administrative search conducted in reasonable, good-faith reliance on a statute later declared unconstitutional. And less than a decade thereafter, in *Arizona v. Evans*,[26] the Court applied the exception to an officer who had "objectively reasonably" relied on mistaken information in a court database indicating that an arrest warrant was outstanding. Most recently, in *Herring v. United States*,[27] the Court invoked the "good-faith" exception when an officer reasonably believed that there was an outstanding arrest warrant in a neighboring county, but his belief, it turned out, had been wrong because of a police employee's negligent bookkeeping error.

In this latest iteration of the good-faith exception in *Herring*, the Court rejected its earlier characterization of the exclusionary rule in *Mapp v. Ohio* as an inherent Fourth Amendment right.[28] Instead, the Court emphasized that the rule "applies only where it 'results in appreciable deterrence'" of police misconduct,[29] meaning that "the benefits of deterrence must outweigh the costs," principally the cost of "letting guilty and possibly dangerous defendants go free"[30] Summarizing the Court's latter-day exclusionary rule jurisprudence, the Chief Justice explained in *Herring*:

> [I]n *Krull* we elaborated that "evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" 480 U.S., at 348–349[, 107 S.Ct. 1160] (citation omitted).... To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deter-

22. *Supra* note 11.

23. *See Leon, supra* note 11, 468 U.S. at 924, 104 S.Ct. 3405.

24. *Id.* at 926, 104 S.Ct. 3405.

25. 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987); *see Michigan v. DeFillippo*, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) (upholding arrest made in good-faith reliance on city ordinance later held unconstitutionally vague).

26. 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995).

27. —— U.S. ——, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009).

28. *Compare Mapp, supra* note 14, 367 U.S. at 649, 657, 81 S.Ct. 1684 *with Herring, supra* note 27, 129 S.Ct. at 700 ("'the exclusionary rule is not an individual right and applies only when it result[s] in appreciable deterrence'") (citations and internal quotation marks omitted).

29. *Herring, supra* note 27, 129 S.Ct. at 700 (quoting *Leon, supra* note 11, 468 U.S. at 909, 104 S.Ct. 3405) (other citation omitted).

30. *Id.* at 701 (quoting *Leon, supra* note 11, 468 U.S. at 910, 104 S.Ct. 3405).

rence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.... We have already held that "our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal" in light of "all of the circumstances." *Leon*, 468 U.S., at 922, n. 23, 104 S.Ct. 3405.[31]

This summary, of course, was presented in the context of police-officer reliance on a warrant, a statute, or other official record germane to an anticipated search. The ultimate question for us, therefore, in determining whether the good-faith exception applies, is whether Officers Eglund and Cepeda properly relied, instead, on appellate court opinions in deciding whether the warrantless search of Debruhl's car was constitutional. More specifically, can a police officer's reliance on appellate opinions supply the check on police behavior—and thus serve as the basis for objective good faith—that statutes, warrants, and other official records provide in advance of a search?

## IV. "MISTAKE OF LAW" v. GOOD-FAITH EXCEPTION

Proponents of the good-faith exception over the years have assumed that it would apply in all Fourth Amendment cases, not just in situations where retroactive application of a Fourth Amendment ruling is at issue. Justice White, for example, has written without reference to retroactivity that the exclusionary rule should "be more generally modified to permit the introduction of evidence obtained in the reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment." [32] That generalization, however, reflects serious overstatement. When asking whether the good-faith exception is available to a police officer who relied on particular case law to justify the warrantless search of an automobile, it is important to recognize that we are considering only a situation in which the Supreme Court has modified a settled rule of law on which the officer relied before the high Court ruled. The exception is not available in the typical "mistake-of-law" scenario confronted regularly in the local trial and appellate courts; and it is very important to understand the distinction here. If the good-faith exception is not properly circumscribed, it can legitimate the very dangers that mistake-of-law analysis has been developed to prevent.

### A. Mistake of Law

Mistake-of-law cases do not involve modifications—whether "clarifications" or "overrulings"—by a higher court. More simply, they concern whether an officer's unlawful actions can be excused by a good-faith but erroneous understanding of the law (without the additional complication of a Supreme Court intervention). For example, assume that Debruhl's case came to this court before *Gant*, and that the arresting officers—aware, presumably, of this court's decisions applying *Belton*—searched Debruhl's car after escorting him away from it in handcuffs.[33] Further as-

---

**31.** *Id.* at 701–703.

**32.** *Leon, supra* note 11, 468 U.S. at 909, 104 S.Ct. 3405 (quoting *Gates, supra* note 14, 462 U.S. at 255, 103 S.Ct. 2317 (White, J., concurring)).

**33.** Whenever we speak of an officer's being aware of the "court's decisions" or the "case law" or "appellate opinions," we do not mean actual, subjective awareness (although police trainers do instruct on the law and officers come to know it). Rather, for purposes of

sume that when the case came before this court, it was a case of first impression in the sense that this fact pattern (a "secured" suspect) had not appeared for decision in any of our previous *Belton*-type cases. And assume, finally, that we decided (foreshadowing *Gant* ) that the officers had relied improperly on *Belton*, that the search had violated the Fourth Amendment, and thus that the evidence seized must be suppressed.

In this situation, the officer's mistake of law in relying on *Belton*-type cases that did not consider the crucial, factual distinction between *Debruhl* and *Belton* would not excuse an unconstitutional search or prevent the resulting suppression of evidence. This is true even if we were to conclude that the officers, in light of earlier cases, had a reasonable if not conclusive basis for believing that a judge would rule in their favor. As to the facts the officers confronted, the law was not "settled" until this court ruled, contrary to the officers' expectations.

■ Courts are explicit: "The justifications for the good-faith exception do not extend to situations in which police officers have interpreted ambiguous precedent *or relied on their own extrapolations from existing caselaw* " (emphasis added).[34] "To create an exception here would defeat the purpose of the exclusionary rule, for it would remove the incentive for police to make certain that they properly understand the law that they are entrusted to enforce and obey."[35] To be clear: the good-faith exception cannot excuse a police officer's mistake of law; the exception applies only when a Supreme Court ruling upsets clearly settled law on which the officer had reasonably relied before the high Court's decision placed the mistake of law on the lower court, not on the officer.

## B. Applying Good Faith Exception

We turn now to the good-faith exception as it applies to the situation actually before us: Debruhl's case came to this court after *Gant*. The government argues that the officers acted in reasonably objective (good faith) reliance on *Belton* and this court's interpretations of it. If our cases interpreting *Belton*, as the government suggests, had "settled" that the officers were allowed to conduct a warrantless search on the facts they encountered in *Debruhl*—that is, if our case law was not ambiguous as to that situation—then, theoretically, the test for the good-faith exception would have been met. The law would have been settled as explicitly as the permission reflected in a judicially-approved warrant (*Leon* ) or an unambiguous statute (*Krull* ),

evaluating legal responsibility, we are speaking of imputed awareness; an officer is presumed to know the law of the jurisdiction the officer is enforcing.

**34.** *United States v. Davis,* 598 F.3d 1259, 1267 (11th Cir.2010).

**35.** *United States v. Lopez–Soto,* 205 F.3d 1101, 1106 (9th Cir.2000); *accord United States v. Chanthasouxat,* 342 F.3d 1271, 1280 (11th Cir.2003) ("[T]he good faith exception established by *United States v. Leon* [citation omitted] should not be extended to excuse a vehicular search based on an officer's mistake of law."); *United States v. Lopez–Valdez,* 178 F.3d 282, 289 (5th Cir.1999) (good-faith, though erroneous, belief that broken taillight violated Texas Transportation Code was unreasonable and does not justify good-faith exception to exclusionary rule because "potential for abuse of traffic infractions as pretext for effecting stops seems boundless and the costs to privacy excessive"); *United States v. Simon,* 368 F.Supp.2d 73, 78–79 (D.D.C. 2005) ("Exclusion of the evidence ... serves the purpose of encouraging law enforcement officers to know the bounds of their authority, which ... is especially important since there is a 'fundamental unfairness [in] holding citizens to 'the traditional rule that ignorance of the law is no excuse' while allowing those 'entrusted to enforce' the law to be ignorant of it.' " (Citations omitted.))

because all material facts presented in *Debruhl* would have been congruent with those in which previous warrantless searches had received this court's blessing.

On the other hand, if our case law on which the officers relied was ambiguous, as applied to the factual scenario at issue in *Debruhl*, then the officers would not have relied on "settled" law, and the good-faith exception would not apply.[36] Indeed, if the exception were to apply in this situation, we would be legitimating a "mistake-of-law" basis for the good-faith exception. More specifically, if this court were to grant the officer slack in determining what facts were material, we would be delegating to the officer, not reserving to the court, interpretation of the facts and law controlling application of the Fourth Amendment and the exclusionary rule. Put still another way, this court would be allowing the officer to rely on relevant, but not controlling, case law to authorize admission of evidence that the court itself might well have suppressed before the Supreme Court announced modification of *Belton* in *Gant*.

We turn, therefore, to the question whether the officers here relied on "settled" law that, before *Gant*, would have permitted their search of Debruhl's car.

## V. DID THE OFFICERS RELY ON SETTLED LAW?

The government argues that a substantial majority of those informed in constitutional law would have concluded that, as of the time of Debruhl's arrest, *Belton*, as commonly interpreted, permitted the search and seizure directed at Debruhl. Accordingly, says the government, whether *Gant* was a "clarification"[37] of *Belton*, as Justice Stevens opined for the majority, or an overruling,[38] as Justice Alito wrote for the four dissenters, it was enough of a surprise that Officers Eglund and Cepeda could not be faulted for acting in accord with *Belton's* traditional interpretation and searching Debruhl's passenger compartment. Their behavior, concludes the government, was "objectively reasonable," and thus in "good faith," consistent with the exclusionary rule exception announced in *United States v. Leon*.[39]

It is not possible to answer this ultimate, "good-faith" question without understanding in more detail how police-officer reliance on appellate opinions works, and whether these opinions would provide the "settled law" justifying a search that, say, the clear authority of a warrant offers. *First*, how is "settled law" defined? Is it merely the applicable rule, such as Justice Stewart's bright-line articulation of the auto compartment search in *Belton?* What if the rule is quite general, such as the "totality of the circumstances" formula for finding probable to cause to arrest based on an informant's tip in *Illinois v. Gates?*[40] Or, focusing more broadly, is

---

36. Three federal circuits, before *Gant*, held that *Belton* did not authorize a warrantless search in *Gant/Debruhl* circumstances. *See United States v. Green*, 324 F.3d 375, 379 (5th Cir.2003) (search unauthorized by *Belton* where arrestee lay handcuffed on ground several feet from vehicle); *United States v. Edwards*, 242 F.3d 928, 938 (10th Cir.2001) (search not authorized by *Belton* where arrestee was handcuffed and seated in police vehicle); *United States v. Vasey*, 834 F.2d 782, 787 (9th Cir.1987) (search not authorized by *Bel-*

ton where arrestee was handcuffed and secured in police car for more than half hour before search).

37. *Id.* at 1719.

38. *Id.* at 1721, 1726 (Alito, J., dissenting).

39. *See supra* note 11.

40. *See Gates, supra* note 14, 462 U.S. at 238, 103 S.Ct. 2317.

"settled" law always an applicable rule as applied to a particular pattern of facts, such that an appellate opinion will not reflect settled law for good-faith exception purposes unless the facts are close, in all material respects, to those confronted by the police officer?

*Second,* what appellate opinions are relevant for determining "settled law"? Only those in the officer's own jurisdiction? What if opinions from this court and from the D.C. Circuit germane to the search are in conflict? What about opinions from other jurisdictions more directly applicable to the facts of the officer's case? Do Supreme Court opinions in tension with those in the officer's local jurisdiction undermine the judicial authority on which the officer would otherwise rely? How do Supreme Court hints, through concurrences and dissents showing dissatisfaction with the Court's own previous rulings, factor in—if at all? In short, what is the jurisprudential universe from which a police officer is to discern "settled law," applicable to the anticipated search, that would justify the good-faith exception to suppression of evidence seized unlawfully?

The discussion begins with *Chimel v. California,*[41] governing warrantless searches incident to arrest. The Court held in *Chimel* that police officers may conduct such searches only within the space under the suspect's "immediate control," defined as "the area from within which he might gain possession of a weapon or destructible evidence."[42] That test became problematic for searches of vehicles incident to the arrest of the driver or other occupants in the vehicle, the issue before the Court in *Belton.*

## A. *Belton*

In *Belton,* after stopping the car for speeding, a police officer came upon four men in the car and, while conversing with them, smelled burnt marijuana and saw an envelope inside the vehicle, which he associated with that substance.[43] The officer ordered all four out of the car, placed them under arrest for unlawful possession of marijuana, patted each of them down, split them into four separate locations on the Thruway, and searched the passenger compartment.[44] There he found marijuana in the envelope and cocaine in a jacket on the back seat belonging to Belton, who moved to suppress that evidence after his indictment for criminal possession of a controlled substance.[45] The New York Court of Appeals reversed the lower courts' denial of Belton's suppression motion, ruling that a "warrantless search of the zippered pockets of an unaccessible jacket may not be upheld as a search incident to a lawful arrest where there is no longer any danger that the arrestee or a confederate might gain access to the article."[46]

The Supreme Court reversed, announcing a bright line rule intended to approximate, as closely as possible, the scope of a search permitted by *Chimel.* Wrote Justice Stewart: "[C]ourts have found no workable definition of 'the area within the immediate control of the arrestee' when that area arguably includes the interior of an automobile and the arrestee is its re-

---

41. 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

42. *Id.* at 763, 89 S.Ct. 2034.

43. *Belton, supra* note 1, 453 U.S. at 455–56, 101 S.Ct. 2860.

44. *Id.* at 456, 101 S.Ct. 2860.

45. *Id.*

46. *Id.* (quoting *People v. Belton,* 50 N.Y.2d 447, 429 N.Y.S.2d 574, 407 N.E.2d 420, 421 (1980)).

cent occupant.... Accordingly, we hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." [47]

### B. *Harris* and *Staten*

Years later, in *United States v. Harris*,[48] this court applied *Belton* to a situation in which police officers stopped a car for running a red light. After discovering that the driver did not possess a valid driver's license, the officers arrested him for that offense, searched and handcuffed him, and locked him in the police cruiser.[49] The two passengers were then ordered out of the car.[50] As the front passenger began to step out of the car, one of the officers saw a handgun at the passenger's feet. The officers looked further and found a bag containing ammunition on the floorboard between the passenger's legs.[51] After the front passenger, Harris, had been indicted for weapons offenses, the motions judge granted his motion to suppress, ruling that the officers "had no basis for

searching the vehicle after [the driver's] arrest for a traffic violation, nor did the officers reasonably fear for their safety." [52] Furthermore, the search had come "well after the arrest of the driver and was therefore not contemporaneous with 'potentially threatening circumstances confronting the officer.' " [53] We reversed, relying on *Belton* and an earlier decision of this court, *Staten v. United States*,[54] where we had affirmed a conviction for weapons offenses based on a search of an automobile's glove compartment after the driver (arrested for driving under the influence of alcohol) and two passengers had been removed from the vehicle. None of the three was sequestered in a patrol car before the search.

*Harris* focused primarily on the "contemporaneous incident" language in *Belton* [55] while *Staten* dealt mainly with the passenger's contention that he had a reasonable expectation of privacy in the glove compartment where the gun was found. Each, therefore, was what we shall call a "pure" *Belton* case in that both concerned searches and seizures of evidence before

**47.** *Id.* at 460, 101 S.Ct. 2860 (quoting *Chimel*, *supra* note 41, 395 U.S. at 763, 89 S.Ct. 2034). The justice continued: "It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach." *Id.*

**48.** 617 A.2d 189 (D.C.1992).

**49.** *Id.* at 190.

**50.** *Id.*

**51.** *Id.*

**52.** *Id.* at 192.

**53.** *Id.* (quoting motions judge).

**54.** 562 A.2d 90 (D.C.1989).

**55.** An earlier decision of this court, with a minimum of discussion, also affirmed a conviction in part by reference to compliance with the "contemporaneous incident" language in *Belton*. *See Smith v. United States*, 435 A.2d 1066, 1068 (D.C.1981) (per curiam), *cert. denied*, 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982). Other decisions of this court over the years have relied minimally on *Belton* in sundry ways, none of which—except for those we discuss—would add to the analysis here. For example, government counsel at oral argument referenced two cases which we do not find helpful to the analysis. *See Olafisoye v. United States*, 857 A.2d 1078 (D.C.2004) (ruling motion to suppress untimely and adding, in dictum, that court saw nothing in record to suggest "a valid ground" for motion to suppress); *Hicks v. United States*, 730 A.2d 657 (D.C.1999) (justifying seizure of shotgun from unlawful search of car on inevitable discovery exception).

all occupants of the car had been removed and secured; as in *Belton,* the risk to police safety and loss of evidence had not entirely abated at the time of the search.

## C. The Movement to *Gant*

Cases in other jurisdictions began to address the question whether *Belton's* bright-line rule was being stretched too far, in derogation of *Chimel,* when passenger compartments were searched after all the occupants of a car had been handcuffed and locked in a squad car away from their vehicle.[56] At the time of the search, could these sequestered occupants still be deemed to occupy space, as *Chimel* required, under their "immediate control," that is, "the area from within which [the occupants] might gain possession of a weapon or destructible evidence"?[57] Courts began to say "No."[58]

That question, as we have seen, eventually came to the Supreme Court in *Gant,* where a 5–to–4 majority also answered "No." For the Court, Justice Stevens wrote:

> The safety and evidentiary justifications underlying *Chimel's* reaching-distance rule determine *Belton's* scope. Accordingly, we hold that *Belton* does not authorize a vehicle search incident to a

recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle.[59]

Because Debruhl had been arrested for a traffic violation, handcuffed, and held by police officers away from his car while it was searched, the government does not contest that, under *Gant,* the search violated the Fourth Amendment.

## D. *Thornton:* From Bright–Line to Cloudy

Five years before Debruhl's arrest, a Supreme Court majority in *Thornton v. United States*[60] had signaled its unease with *Belton.* The supposed bright line rule was cracking; its application had become uncertain.

In *Thornton,* decided in 2004, police officers on patrol who were suspicious of a passing car discovered, after a radio check, that the tags and the car did not match.[61] Before the officers could stop the car, the driver pulled into a parking lot and got out of the car.[62] The officers approached and arrested the driver, patted him down, and found marijuana and cocaine.[63] The police handcuffed him, put him in the patrol car, then searched his car and found a hand-

---

**56.** *See supra* note 36.

**57.** *Chimel, supra* note 41, 395 U.S. at 763, 89 S.Ct. 2034.

**58.** *See supra* note 36.

**59.** *Gant, supra* note 2, 129 S.Ct. at 1714. In restating the Court's holding at the end of the opinion, Justice Stevens added a second justification, italicized below, for searching the vehicle drawn from Justice Scalia's opinion concurring in the judgment in *Thornton v. United States,* 541 U.S. 615, 625, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004):

> Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search *or it*

> *is reasonable to believe the vehicle contains evidence of the offense of arrest.* When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies.

*Gant, supra* note 2, 129 S.Ct. at 1723–24 (emphasis added).

**60.** *Supra* note 59.

**61.** *Supra* note 59, 541 U.S. at 617–18, 124 S.Ct. 2127.

**62.** *Id.*

**63.** *Id.*

gun.[64] In affirming the denial of the motion to suppress, the Supreme Court rejected the defense argument that a *Belton* search was limited to situations in which the police initiated contact with a suspect while he was still in the car.[65]

On the facts, therefore, *Thornton* reflects an extension of *Belton* (although not on the security issue addressed in *Gant*). In reaching its result, however, the *Thornton* Court fractured, with one justice concurring dubitante,[66] two justices concurring only in the judgment on an alternative theory,[67] and two justices dissenting.[68] A Court majority, therefore, concluded that *Belton*, as commonly interpreted, had come to undermine the traditional limitation on searches incident to arrest—a limitation that *Belton's* bright line rule had supposedly been fashioned to protect.

Without doubt, a Court majority telegraphed its belief that *Belton* lay on a "shaky foundation,"[69] had become a "swollen rule,"[70] indeed a rule stretched "beyond its breaking point."[71] In short, by 2004 five sitting justices had strongly advocated either revision or abandonment of *Belton*, with some pointing out the very flaws stressed five years later in the Court's corrective decision in *Gant*. Careful Court watchers could not have failed to notice.

We hasten to add that we are not at all suggesting that these ruminations from a majority of the justices amount to a formal rejection of *Belton*. *Thornton's* interpretation of *Belton* remained good law until the Court itself ruled in *Gant*.[72] We cite the justices' disquiet, however, simply to demonstrate that bright-line rules do not

---

64. *Id.* at 618, 124 S.Ct. 2127.

65. *Id.* at 623–24, 124 S.Ct. 2127.

66. *See id.* at 624–25, 124 S.Ct. 2127 (O'Connor, J., concurring) (citing *"Belton's* shaky foundation" and expressing "dissatisfaction with the state of the law in this area" because "lower court decisions seem now to treat the ability to search a vehicle incident to the arrest of a recent occupant as a police entitlement rather than as an exception justified by the twin rationales of *Chimel v. California* ").

67. *See id.* at 625, 631, 124 S.Ct. 2127 (Scalia, J., joined by Ginsburg, J., concurring in the judgment) (offering alternative theory to justify search after noting that, because petitioner "was handcuffed and secured in the back of the officer's squad car" at the time police searched the passenger compartment, the risk of his grabbing weapon or evidence from his car was "remote in the extreme," and thus the "Court's effort to apply our current [*Belton* ] doctrine to this search stretches it beyond its breaking point.... [I]f we are going to continue to allow *Belton* searches on *stare decisis* grounds, we should at least be honest about why we are doing so. *Belton* cannot reasonably be explained as a mere application of *Chimel* ").

68. *See id.* at 633–34, 636, 124 S.Ct. 2127 (Stevens, J., joined by Souter, J., dissenting) (opining that "[n]either the rule in *Chimel* nor *Belton's* modification of that rule would have allowed the search of petitioner's car.... The bright-line rule crafted in *Belton* " to serve "the interest of certainty" for searches of vehicle passenger compartments "is not needed for cases in which the arrestee is first accosted when he is a pedestrian[;] ... the Court extends *Belton's* reach without supplying any guidance for the future application of its swollen rule").

69. *See supra* note 66.

70. *See supra* note 68.

71. *See supra* note 67.

72. *See Agostini v. Felton*, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ("[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.") (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)).

easily remain radiant. Although *Belton* was announced as a bright-line rule intended for simple, clear cut application, it is evident from *Belton's* history that such rules are often likely to remain truly "bright line" only for a limited period of time as factual scenarios test their limits.[73] *Belton* has become a classic case of a rule beclouded over time by exceptions generated by unique facts that pushed decisions beyond the "bright line" license—as evidenced by the three federal circuits that anticipated *Gant.*[74]

Consequently, the likelihood of a police officer's finding "settled law" attributable to *Belton* has diminished over time as new factual scenarios outpace *Belton*-type decisions that do not quite tell an officer what is, and is not, allowed in the new situation the officer faces. *Belton's* rule is not yet as amorphous a rule as those reflecting the "totality of the circumstances" or excusing the warrant requirement for "exigent circumstances." But it has been heading in that opaque direction; it has been losing its currency. Accordingly, an appellate court confronted by the government's argument that the good-faith exception applies in a particular case—*Belton*-type or otherwise—must be very careful in appraising whether a police officer has relied on truly "settled law" in the jurisdiction—meaning settled as to the material facts at issue.

Two federal circuits have recently applied that strict limitation when applying the good-faith exception. *United States v. Davis* [75] concerned a pre-*Gant* search of an automobile after all the occupants had been secured with handcuffs and placed in a patrol car. The U.S. Court of Appeals for the Eleventh Circuit, ruling after *Gant* came down, applied the exception and allowed admission of the seized firearm. The court stressed, however, that "the governing law in this circuit unambiguously allowed Sergeant Miller to search the car." [76] Added the court: "Relying on a court of appeals' well-settled and unequivocal precedent is analogous to relying on a statute [citing *Krull*]." [77] In *United States v. McCane,*[78] a similar case concerning suspects secured in a patrol car, the Tenth Circuit emphasized that the police officers, in seizing a firearm from the occupants' car, had relied on "settled" case law "factually indistinguishable from the instant case." [79]

■ To repeat: there is a crucial predicate that must be satisfied before the warrantless search of an automobile under

**73.** Courts have had to grapple with a potpourri of *Belton* issues, not only, as here, whether the arrestee's removal from the car cuts off the right to conduct a warrantless search, but also, as in *Thornton, supra* note 59, how far from the car a suspect can be arrested while the police retain authority to search the car, and, as in *Harris, supra* note 48, how long after the arrest the officers still have *Belton* authority to search as a "contemporaneous incident" of that arrest. *See Gant, supra* note 2, 129 S.Ct. at 1721 nn. 6 & 7.

**74.** *See supra* note 36.

**75.** *Supra* note 34.

**76.** *Id.,* at 1267 n. 10.

**77.** *Id.*

**78.** 573 F.3d 1037 (10th Cir.2009), *cert denied,* 78 U.S.L.W. 3221 (U.S. Mar. 1, 2010) (No. 09–402).

**79.** *Id.* at 1041, 1044 (citing *United States v. Humphrey,* 208 F.3d 1190 (10th Cir.2000)). Similarly, the Supreme Court of Utah, in applying the good-faith exception to a *Belton* search, recently cautioned: "If the case law had been ambiguous prior to the time the officers conducted a search later definitively declared unconstitutional, the good-faith exception would not apply and the evidence would be excluded." *Utah v. Baker,* 229 P.3d 650, 664 (Utah 2010).

*Belton* law can be a candidate for the good-faith exception. The tribunal's interpretation of the Supreme Court's rule on which the officer relies must be "settled" *as applied to all the material facts the officer faces.* Short of satisfying that strict requirement—*i.e.,* a requirement of explicit protection or "cover" from the court on which the officer relies—we cannot say that the officer's search would be objectively reasonable enough for the good faith exception to apply. Otherwise that officer, conducting a search later held unlawful by the Supreme Court, would be in no better position than that of the officer in a typical mistake-of-law situation who arguably makes a reasonable, but ultimately incorrect, guess at the lawfulness of the search.

It is important to emphasize that we are not defining "settled law" to mean case law that has addressed facts identical to those confronting the officer who conducts the search. We are referring, rather, only to the material facts—to the handful of variables, material to ascertaining a lawful *Belton* search, that police officers permissibly take into account. These include the degree to which the search is contemporaneous with the arrest,[80] the proximity of the occupant to the vehicle, both temporally and spatially, when the officer makes a lawful arrest;[81] the need to search the vehicle in relation to the offense that justified the stop,[82] and, the extent of sequestering the suspect and other occupants in relation to the search.[83]

### E. Unsettled Law

The government argues that the police officers who seized the incriminating evidence from Debruhl's car satisfied the good-faith test by taking "objectively reasonable"[84] action in doing so. They adhered, says the government, to the traditional understanding of the Supreme Court's authoritative decision in *Belton* and this court's application of that authority in *Harris*[85] and *Staten*[86]—case law in effect at the time of Debruhl's arrest a few months before *Gant* was decided. Even according to Justice Stevens for the *Gant* majority, notes the government, *Belton* "has been widely understood to allow a vehicle search incident to the arrest of a recent occupant even if there is no possibility the arrestee could gain access to the vehicle at the time of the search."[87] Therefore, says the government, exclusion of the evidence from Debruhl's trial would not deter police misconduct because the officers, applying the correct law at the time—indeed, "engaging in a practice they

---

80. *See Belton, supra* note 1, 453 U.S. at 460, 101 S.Ct. 2860.

81. *Compare Thornton, supra* note 59, 541 U.S. at 622, 124 S.Ct. 2127 (declining to address argument that *Belton* rule applies only to "recent occupants" of vehicle, while noting that petitioner had conceded "he was in 'close proximity, both temporally and spatially,' to his vehicle" when approached by police officer) *with Lewis v. United States,* 632 A.2d 383, 388–89 (D.C.1993) (holding *Belton* did not extend to search of vehicle incident to arrest of individual "who has parked, locked, and walked fifteen to twenty feet away from an automobile before being stopped and arrested").

82. *See Gant, supra* note 2, 129 S.Ct. at 1723–24 (quoted *supra* note 59).

83. *See id.* at 1714, 1723–24 (quoted *supra* note 59 and in accompanying text).

84. *Leon, supra* note 11, 468 U.S. at 926, 104 S.Ct. 3405.

85. *Supra* note 48.

86. *Supra* note 54.

87. *Gant, supra* note 2, 129 S.Ct. at 1718.

never expected to be invalidated"[88]—did nothing wrong.

Counsel for the government was asked at oral argument whether the universe of appellate opinions that yields the "settled law" for this case is limited to the jurisprudence of this court (as we have interpreted *Belton* ), or embraces the larger universe that includes relevant case law from other jurisdictions, as well as Supreme Court developments. Counsel replied that this court is the proper source of settled law for good-faith purposes (although he acknowledged that the relevant universe would not necessarily be limited to local case law if it was "so obviously incorrect" that the police should favor sound law found elsewhere—a remote possibility, he said, not presented here). We agree with the government: we need not definitively resolve how broadly the universe of "settled law" might extend in unusual circumstances; we are satisfied that *Belton,* as interpreted by this court as of the time of the officers' search, is the law on which this case should turn.[89]

We do not believe that our case law supports the government's position in light of the strict requirements for appraising "settled law" for good-faith exception purposes. If we focus carefully on this court's *Belton* decisions before *Gant,* it is possible to say—contrary to the government's contention-that this court might well have held the search of Debruhl's car unlawful and the evidence inadmissible. We say this because *Debruhl's* facts differ from those in *Staten* and *Harris* in a legally significant way, indeed in the very way that became determinative in *Gant.* In neither *Staten* nor *Harris* had all the occupants been removed from the car and secured with handcuffs before the search; they were, as we have noted, "pure" *Belton* cases, legally indistinguishable from *Belton* on the facts.[90]

In Debruhl's case, like Gant's, all occupants of the car had been removed and secured before the search, a factual distinction from *Belton* which, as we have repeated, caused three federal circuits before *Gant* to rule that *Belton* did not apply.[91] Therefore, if Debruhl's counsel had litigated his motion to suppress before *Gant* was decided, counsel might well have persuaded the Superior Court, and then this court, that on the facts here the law was unsettled in this jurisdiction; that *Staten* and *Harris* were therefore not controlling; and that in light of the case law from other jurisdictions reflecting *Chimel's* limitation on *Belton's* reach, *Belton* should not be read to permit the search of Debruhl's car.[92] (In this hypothetical case, of course,

---

**88.** *Johnson, supra* note 17, 457 U.S. at 560, 102 S.Ct. 2579.

**89.** Neither party has called our attention to a case from the D.C. Circuit that would be relevant here.

**90.** In *M.A.P. v. Ryan,* 285 A.2d 310 (D.C. 1971), we adopted a rule that "no division of this court will overrule a prior decision of this court." *Id.* at 312. For example, in *Harris, supra* note 48, 617 A.2d at 192, we concluded that most of the factual differences from *Staten, supra* note 54, were immaterial, and that a *Belton* search "under these circumstances [was] proper" because *Staten,* as "directly

applicable authority" for applying *Belton,* could not "be distinguished from the facts of this case." In contrast, given the major factual difference between *Debruhl* and *Staten/Harris,* we are satisfied that this prior case law would not have bound a later division of the court, before *Gant,* to sustain the search of Debruhl's car.

**91.** *See supra* note 36.

**92.** This would not have been the first case in which we held that the government's *Belton* argument had stretched the facts beyond *Belton's* proper reach. *See Lewis, supra* note 81, 632 A.2d at 388–89.

as explained in Part IV., the officers would have relied on a mistake of law, and the good-faith exception would not have applied.)

We are not saying to a certainty that, before *Gant*, every division of this court would unanimously have found an unlawful search based on the facts here. We are saying, however, that the facts matter in determining what is "settled law," and that the police officer's reliance on *Staten* and *Harris*—on "pure *Belton*" cases—to justify the search of Debruhl's car would have been reliance on relevant but not on "settled" law; the case was one of first impression in this jurisdiction.

■■■ All things considered, therefore, it is not possible to conclude that Officers Eglund and Cepeda relied on "settled" law authorizing their search of Debruhl's car. Even if, as Justice Stevens acknowledged, *Belton* may have been "widely understood"[93] to allow warrantless searches of vehicle passenger compartments without limitation incident to an arrest, momentum against such a sweeping interpretation on facts such as those in Debruhl's case had been accelerating in the courts for years before his arrest. And no decision by this court had held that a police officer had a right, under *Belton*, to search a car after all its occupants had been removed and secured.

## VI. JUDICIAL DECISIONS AS PREDICATES FOR GOOD-FAITH EXCEPTION

We have been focusing on judicial decisions, more particularly on appellate opinions, as a basis for the good-faith exception and premising that discussion on an officer's reliance on case law congruent in all material respects with the search the officer is anticipating. As in *Davis*[94] and *McCane*[95] cited earlier, a number of federal and state courts have also accepted case law as an appropriate predicate for good-faith reliance.[96] They presume that appellate opinions, dealing with earlier events, can have the same prospective reliability as a warrant or unambiguous statute that invites "objectively reasonable" reliance on its clarity and presumed validity for a look at an upcoming search.

Other courts, noting that an appellate opinion based on past events is not directed at the specific facts of an anticipated search, and thus is not express authority for that upcoming intrusion, have declined to premise the good-faith exception on judicial opinions.[97] These courts are con-

---

93. *Gant, supra* note 2, 129 S.Ct. at 1718.

94. *Supra* note 34.

95. *Supra* note 78.

96. *See United States v. Jackson*, 825 F.2d 853 (5th Cir.1987); *United States v. Owens*, 2009 WL 2584570 (N.D.Fla. Aug. 20, 2009); *United States v. Wesley*, 649 F.Supp.2d 1232 (D.Kan. 2009); *United States v. Allison*, 637 F.Supp.2d 657 (S.D.Iowa 2009); *United States v. Grote*, 629 F.Supp.2d 1201 (E.D.Wash.2009); *United States v. Mays*, 2009 WL 536912 (E.D.Wis. Mar. 3, 2009); *Colorado v. Key*, —— P.3d ——, 2010 WL 961646 (Colo.App., Mar. 18, 2010); *Meister v. Indiana*, 912 N.E.2d 412 (Ind.Ct. App.2009); *Utah v. Baker, supra* note 79; *Wisconsin v. Ward*, 231 Wis.2d 723, 604 N.W.2d 517 (2000).

97. *See United States v. Real Property located at 15324 County Highway E*, 332 F.3d 1070,1076 (7th Cir.2003) ("[s]uch expansion of the good-faith exception would have undesirable, unintended consequences, principal among them being an implicit invitation to officers in the field to engage in the tasks—better left to the judiciary and members of the bar more generally—of legal research and analysis"); *United States v. Peoples*, 2009 WL 3586564 (W.D.Mich.) (Oct. 29, 2009) (rejecting good faith exception for retroactive application of *Gant* because reliance on police officer's own interpretation of case law is "materially different" from reliance on pre-search check by warrant or express statute); *Illinois v. Arnold*, 394 Ill.App.3d 63, 333 Ill.Dec. 331, 914 N.E.2d 1143, 1158 (2009) (settled Fourth Amendment law of Illinois precluded search

cerned that a trial judge or appellate panel may define "settled law" too loosely and thereby invite police officers, rather than the courts, to prescribe when exclusion is—and is not—appropriate. In other words, there is a concern that unless the courts define "settled law" tightly enough to provide an unambiguous road map to guide the warrantless search, the courts will be merging the discredited "mistake-of-law" defense (*see supra* Part IV.) into the good-faith exception, with all the mischief that this could entail. The danger would be too many police officers judging their own authority expansively—and thus more and more often erroneously—with serious erosion of the deterrence called for by the exclusionary rule. Put another way, a court's failure to interpret "settled law" strictly—including an unwillingness to call the law "unsettled" on the fact pattern presented—would be an invitation to police misconduct through interpretation of judicial opinions in ways that will narrow the rule of exclusion and force the courts to announce empty Fourth Amendment violations.

In *Krull,* the Supreme Court recognized this very danger:

> [T]he question whether the exclusionary rule is applicable in a particular context depends significantly upon the actors who are making the relevant decision that the rule is designed to influence. *The answer to this question might well be different when police officers act outside the scope of a statute, albeit in good faith. In that context, the relevant actors are not legislators or magistrates, but police officers who concededly are "engaged in the often competitive enterprise of ferreting out crime."* (Emphasis added.) [98]

Moreover, in *Leon* and its Supreme Court progeny, there was a third-party check or checkpoint—a judicial magistrate, a warrant clerk, a record officer, or the plain language of a statute—*before* the officer was entitled to conduct the search. When an officer is allowed instead to rely on police academy interpretation of judicial opinions to justify a search without additional, clear guidance, the potential for slippage into unconstitutional terrain is obvious.[99]

of vehicle "absent concerns about officer safety or the preservation of evidence"); *Smith v. Virginia,* 55 Va.App. 30, 683 S.E.2d 316, 327 (2009) (Supreme Court "did not intend in *Herring* to extend the good faith exception" to admission of evidence "based on the searching police officer's honest but erroneous belief about what the Fourth Amendment requires"); *see also United States v. Gonzalez,* 578 F.3d 1130 (9th Cir.2009) (rejecting good faith exception because it would conflict with Supreme Court's retroactivity precedents, *Johnson* and *Griffith* ); *United States v. Buford,* 623 F.Supp.2d 923, 926–927 (M.D.Tenn. 2009) (rejecting good-faith exception because of "perverse result" that Gant and others "arrested pre-*Gant* " would not be entitled to suppression while anyone arrested after *Gant* "would be entitled to suppression" and, further, because *Gant* "held implicitly" that exclusionary rule applied retroactively despite police officers' "reliance in good faith on ex-

isting case law"); *Washington v. Harris,* 154 Wash.App. 87, 224 P.3d 830, 2010 WL 45755 (2010) (extending good-faith exclusionary rule "would conflict with the rule granting retroactive application of new constitutional rules in criminal cases," citing *Griffith* and *Gonzalez* ).

98. *Krull, supra* note 25, 480 U.S. at 360 n. 17, 107 S.Ct. 1160 (quoting *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948)).

99. *Cf. Johnson, supra* note 17, 457 U.S. at 561, 102 S.Ct. 2579 ("If, as the [g]overnment argues, all rulings resolving unsettled Fourth Amendment questions should be nonretroactive, then, in close cases, law enforcement officials would have little incentive to err on the side of constitutional behavior." The police, rather, would feel encouraged " 'to disregard the plain purport of our decisions and to

If we say that case law, like a warrant, can serve as a basis for the good-faith exception, there is language in *Herring* that—unless this court defines "settled law" narrowly and precisely—would appear to allow the police officer, not the court, to define the "settled law" that permits the search. Assume, contrary to our decision here, that we were *not* to define our "settled" *Belton* law by reference to a published opinion reflecting the material facts applicable to the officer's intended search—in short, a roadmap akin to the clarity of a warrant. Absent that limited definition, *Herring* would permit suppression of the evidence seized "only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search *was unconstitutional* under the Fourth Amendment," namely, that "a reasonably well trained officer would have known that the search *was illegal*" in light of "all of the circumstances." (Emphasis added.)[100] With this legal protection that the officer could search unless he knew the search "was unconstitutional," an officer could rely on a plausible, though not established, interpretation of *Belton* that would justify the search of Debruhl's car without regard to whether Debruhl had been removed and secured before the search. Mere "plausible" law would become "settled" law, without regard to how this court might have evaluated the search in the first instance.

## VII. CONCLUSION

We share the concerns about equating decisional law with warrants, statutes, and other independent checks on police searches that would excuse application of the exclusionary rule.[101] Until experience proves otherwise, however, we are not willing to assume now that trial judges and appellate panels in this jurisdiction will fail to strictly construe the "settled law" requirement underlying the good-faith exception. We are willing to allow for the possibility that a police officer's reliance on judicial precedent tending to support a particular search and seizure can be the legal equivalent of good-faith, objectively reasonable reliance on a defective or recalled warrant (*Leon, Evans*), or a state statute (*Krull*), or an erroneous police record (*Herring*). We are not willing to stop the discussion by ruling that judicial precedent, as a category, will always be too imprecise for a police officer to rely on it with reasonably objective certainty. We anticipate that our strict rule of construction will be followed. And we would be violating that rule, to be sure, if we were to permit the good-faith exception to apply in Debruhl's case.

*Affirmed.*

---

adopt a let's-wait-until-it's-decided approach.' " (quoting *Desist v. United States,* 394 U.S. 244, 269, 277, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) (Fortas, J., dissenting))).

**100.**  *Herring, supra* note 27, 129 S.Ct. at 701, 703.

**101.**  In *United States v. Edelen,* 529 A.2d 774 (D.C.1987), a case before *Herring* that applied *Leon* and *Krull,* this court stressed an essential predicate for finding the objectively rea-

sonable reliance by a police officer that justifies the good-faith exception. That predicate was the "intervention by a neutral, third party"—for example, a "judge or magistrate" (issuing a warrant) or a "legislature" (enacting an unambiguous statute) or (we shall add) a warrant clerk—that affirmatively grants approval of, or otherwise expressly justifies, the particular search before it takes place. *Id.* at 784, 785. We called such intervention "a key requirement triggering the application of the rule of nonexclusion." *Id.* at 784.